J-S35021-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| THOMAS CALEB, | |
| Appellant | No. 1883 EDA 2014 |

Appeal from the Judgment of Sentence June 2, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):
CP-51-CR-0006440-2012
CP-51-CR-0006441-2012

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                 **FILED JUNE 20, 2016**

Appellant, Thomas Caleb, appeals from the judgment of sentence of 12½ to 25 years' incarceration, followed by 10 years' probation, imposed after a jury convicted him of involuntary deviate sexual intercourse (IDSI), incest, endangering the welfare of a child, and indecent assault.  After careful review, we conclude that all of Appellant's issues are meritless, except for his challenge to the legality of a mandatory minimum sentence imposed under 42 Pa.C.S. § 9718 (Sentences for offenses against infant persons).  Accordingly, we vacate Appellant's judgment of sentence and remand for resentencing.

The trial court summarized the facts of Appellant's offenses as follows:

On May 14, 2012, Appellant was arrested for committing sexual acts with his half-sister, R.M., age fourteen at the time of

the incident, and his niece, S.G., age twelve at the time of the incident. In April of 2012, Appellant performed oral sex on R.M. and forced R.M. to reciprocate. On another spring day in 2012, Appellant performed oral sex on S.G., attempted to have intercourse with her, and showed her a video on his phone of him receiving oral sex from his girlfriend. That same day, S.G. reported the sexual abuse to her mother's boyfriend who, at S.G.'s request, did not inform anyone of this report until one week later when he told S.G.'s mother that she needed to speak with her daughter and niece[, R.M.] The mother immediately spoke with S.G., learned of the abuse, and took both girls to the detective division to make formal statements.

Trial Court Opinion (TCO), 5/18/15, at cover page.[1]

As noted by the trial court, Appellant was arrested on May 14, 2012, and charged with the above-stated offenses. A jury trial was conducted in November of 2013, at the close of which Appellant was convicted of each of those crimes. On June 6, 2014, the court sentenced Appellant to an aggregate term of 12½ to 25 years' imprisonment, which included a mandatory term of 10 to 20 years' incarceration for Appellant's IDSI offense pursuant to 42 Pa.C.S. § 9718. Appellant also received a consecutive term of 2½ to 5 years' imprisonment for his incest offense, and an aggregate term of 10 years' probation for his remaining crimes.

Appellant filed a timely notice of appeal, as well as a timely Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, he raises four claims for our review:

---

[1] The trial court's opinion begins numbering on the second page, leaving the first page of the opinion (from which this excerpt was quoted) unnumbered.

- 2 -

1. Did the lower court err in denying [A]ppellant's motion *in limine* to allow [A]ppellant to present evidence that he had argued with one of the complainants over her relationship with an older man, where the evidence was relevant to establish that the complainant had a motive to lie and [Appellant] did not seek to introduce evidence of [the] victim's sexual activity?

2. Did the lower court abuse its discretion in allowing the Commonwealth to elicit testimony from two detectives that it was common in their experience for child victims to disclose information over time?

3. Did the lower court err in requiring [A]ppellant to testify with a sheriff standing behind him on the witness stand?

4. Is [A]ppellant's mandatory minimum sentence unconstitutional in light of *Alleyne v. United States*, 133 S.Ct. 2151 (2013)?

Appellant's Brief at 3.

Appellant's first issue challenges the court's decision to preclude him from presenting certain evidence.

The admissibility of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon abuse of discretion. An abuse of discretion will not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. Moreover, an erroneous ruling by a trial court on an evidentiary issue does not necessitate relief where the error was harmless beyond a reasonable doubt.

*Commonwealth v. Travaglia*, 28 A.3d 868, 873–74 (Pa. 2011) (citation omitted).

By way of background, Appellant filed a motion *in limine* in January of 2013, and a hearing was conducted on that motion on January 14, 2013. There, Appellant argued that he should be permitted to admit evidence that

one of his victims, R.M., had been involved in a relationship with an older, married man and, when Appellant had discovered the relationship, he and R.M. had argued. N.T. Hearing, 1/14/13, at 13-14. During the argument, Appellant threatened to reveal R.M.'s relationship to her family and, shortly after that argument, R.M. alleged that Appellant had sexually abused her. *Id.* at 14. Appellant contended that evidence of R.M.'s relationship with the older man, and the argument that occurred between her and Appellant, should be admitted to demonstrate R.M.'s "motive to fabricate or lie and make up allegations against [Appellant]." *Id.*

The Commonwealth argued that the court should deny Appellant's motion because presenting the evidence of R.M.'s relationship with the older man would violate the Rape Shield Law, 18 Pa.C.S. § 3104.[2] Ultimately, the trial court agreed, and issued an order denying Appellant's motion *in limine*.

_____

[2] The Rape Shield Law states:

> **(a) General rule.**--Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.
>
> **(b) Evidentiary proceedings.**--A defendant who proposes to offer evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on

*(Footnote Continued Next Page)*

However, new counsel entered his appearance on Appellant's behalf in October of 2013, and at a jury *voir dire* proceeding conducted on November 14, 2013, that attorney presented an oral motion *in limine*, again requesting that the court admit evidence of R.M.'s relationship with the older man. At the hearing, defense counsel explained that upon further investigation, he discovered that Appellant had discovered R.M.'s relationship with the older man, and that three to four weeks prior to R.M.'s making abuse allegations against Appellant, Appellant had directed R.M. to end the relationship or he was "going to kill [the] guy." N.T. Hearing, 11/14/13, at 9. Defense counsel claimed that

> [a]t that point, the relationship between [Appellant] and [R.M.] soured. It completely fell apart. There was a breakdown in communication. She refused to talk to him anymore. They were at odds with one another, and they lived in the same house. Three to four weeks later, RM makes these accusations, and [Appellant is] arrested and he's taken out of the house. And from what I have from [R.M.'s] Facebook page with this [older man], she continues on [with her relationship with him].

*Id.* at 9-10.

The Commonwealth again argued that the Rape Shield Law precluded this evidence, noting that the court had already ruled as much in January of

_(Footnote Continued)_ _____

> their faces, the court shall order an in camera hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).

18 Pa.C.S. § 3104.

2013. *Id.* at 15-16. In response, defense counsel maintained that evidence regarding the context of Appellant's argument with R.M., *i.e.*, R.M.'s relationship with the older man and Appellant's threat to her to end it, did not violate the Rape Shield Law. *Id.* at 17. Counsel explained:

> [Defense Counsel]: The attorney for the Commonwealth keeps saying this violates rape shield, this violates rape shield. The Rape Shield [Law] was created in order to prevent testimony regarding the sexual activity of the complainant that showed this person who is the victim or alleged victim of a crime had had sex before and therefor she was unchaste. … I'm not asking to have any of that type of information admitted, to her lack of chastity, to her sexual relationship with any man whatsoever. In fact, in my argument a little while ago, I didn't even bring out the fact that she might have had a sexual relationship with this older man. I don't want any of that to come in. My argument is limited to the notion of motive for retribution. And there has to -- that motive for retribution, it didn't happen inside of a bubble. There's a larger world that it did happen within, and now there's corroborating evidence [*i.e.*, R.M.'s Facebook postings,] that does show a motive for actual retribution based upon real-world facts.

*Id.* at 17-18. The trial court ultimately ruled that Appellant could offer evidence that R.M. and he had engaged in an argument shortly before her allegations of abuse, but denied Appellant's request to present evidence regarding the argument being about R.M.'s relationship with an older man. *Id.* at 16.

Now, on appeal, Appellant challenges the trial court's decision, arguing that "the lower court was obligated, at a minimum, to conduct an *in camera* hearing, hear[] the proffered testimony, and determine whether the probative value of the information outweighed any prejudice. Having been

denied that hearing, [A]ppellant is entitled to a new trial." Appellant's Brief at 11-12. Notably, however, Appellant at no point requested, at the November 14, 2013 hearing or at the hearing in January of 2013, that the court conduct an *in camera* hearing to consider R.M.'s testimony. While the Rape Shield Law requires the trial court to conduct such a hearing if it "determines that the motion and offer of proof are sufficient on their faces," Appellant explicitly argued at the hearing that the Rape Shield Law *did not apply* to the evidence he sought to admit. Thus, Appellant cannot now contend that the court erred by not holding an *in camera* hearing when Appellant did not request that the court do so.

Nevertheless, Appellant does argue that the evidence regarding R.M.'s relationship with another man should not have been precluded. In this vein, Appellant discusses several cases wherein this Court held that evidence of a victim's prior sexual activity was admissible to demonstrate his/her motive in making abuse allegations against the defendant. **See** Appellant's Brief at 9-11 (discussing **Commonwealth v. Black**, 487 A.2d 396 (Pa. Super. 1985), **Commonwealth v. Wall**, 606 A.2d 449 (Pa. Super. 1992), and **Commonwealth v. Eck**, 605 A.2d 1248 (Pa. Super. 1992)).

In **Black**, the appellant was convicted of molesting his thirteen-year-old daughter in a case that turned on a battle of credibility between Black and his victim. At trial, Black was prevented from introducing evidence of the victim's sexual conduct with one of her brothers, despite the following facts:

While the sexual incident was found to have occurred during Christmas, 1979, testimony indicated that [the victim]'s complaints began to surface almost three months later, near the end of March, 1980. These complaints coincided with violent arguments between [Black] and prosecutrix' fifteen-year-old brother, which culminated in the brother leaving home and separating from the family, including prosecutrix. [The victim] admitted wanting her brother back in the home, and other testimony indicated that as soon as [Black] was arrested and removed, the fifteen-year-old brother contacted the family and sought to return home. In his defense, [Black] offered to show through cross-examination that [the victim] had maintained an ongoing, consensual sexual relationship with this brother, which ended when the brother left home. [Black] contends that the true extent of prosecutrix' bias against him could only be revealed by showing the abnormal, sexual relationship which she had with her brother and which had been terminated by [Black]'s dispute with her brother. Specifically, [Black] urges that [the victim]'s testimony can only be weighed fairly when measured against her desire, first, to punish [Black] for his interference with her sexual relationship with her brother, and, second, to remove [Black] from the home so that her brother might return and resume the relationship.

*Black*, 487 A.2d at 398.

In *Black*, the trial court excluded this evidence under the Rape Shield Law. This Court reversed and remanded for the trial court to hold an *in camera* hearing, with the following instructions:

At this hearing, the trial court should determine the following as a matter of record to be preserved for appellate review: (1) whether the proposed evidence is relevant to show bias or motive or to attack credibility; (2) whether the probative value of the evidence outweighs its prejudicial effect; and (3) whether there are alternative means of proving bias or motive or to challenge credibility.

*Id.* at 401.

Although superficially analogous to the instant case, *Black* is distinguishable. The appellant in *Black* was denied the ability to present

- 8 -

any evidence pertaining to the victim's relationship with her brother. As was evident from the instructions we gave to the trial court in *Black*, its blunt application of the Rape Shield Law prevented critical inquiries into the probative versus prejudicial effect of the proffered evidence, and gave no consideration to 'alternative means' of introducing the evidence so as to minimize Rape Shield concerns.

Here, by contrast, the trial court implicitly acknowledged that the evidence in question was probative of a legitimate purpose: the victim's motive to lie. But, in a compromise reflecting both the probative value of this evidence *and* legitimate Rape Shield concerns, the trial court permitted Appellant to present evidence of his argument with the victim, but did not permit him to implicate the victim's sexual relationship with another man. Thus, the trial court here did precisely what the trial court in *Black* did not do: it considered the probative and prejudicial value of the evidence in question, and arrived at a solution that ostensibly maximized both Appellant's interest in proving the victim's motive to lie and the Commonwealth's interest in avoiding the defense's exploitation of the victim's sexual history.

Appellant believes the trial court's ruling went too far. Appellant "sought to introduce evidence that R.M. had been involved in a relationship with an older man with a criminal record, and that [A]ppellant had threatened to kill that man if R.M. did not terminate the relationship." Appellant's Brief at 11. Appellant contends that the court's limiting the

evidence to "vague testimony of an argument is simply not of the same caliber to explain the bias or basis for retribution." *Id.* Appellant also maintains that the court's decision was an abuse of discretion in light of the fact that he "attempted to limit the prejudice to R.M. by refraining from any mention of a physical relationship and merely focusing on the argument." *Id.*

There is at least some theoretical merit to this claim. We agree that the mere mention of a fight between siblings is significantly less impactful of a reason to fabricate charges of this severity. All siblings argue and fight, but not all siblings threaten to kill the adult paramour of an underage sibling. Moreover, it should be possible to identify the nature of the argument between Appellant and R.M. without exposing unnecessary details about the nature of R.M.'s relationship with the other man.

Nevertheless, we decline to grant Appellant a new trial based on his assertion that he was not able to present a full defense regarding R.M.'s motive to fabricate her allegations, where Appellant himself did not develop this defense to the fullest extent possible in his own testimony.

Appellant did testify regarding the argument. After indicating that he had a great relationship with R.M., the following direct examination took place:

Q      At some point did that relationship change?
A      Yes, it did.

Q    Okay.    And what was the event that caused that relationship to change?

A    About a month and a half, about two months before I was arrested, we had a real big argument, not just like a regular argument that you would normally have back and forth with your sibling, but it was a big blowup and our relationship went sour.

…

A    Well, the end result of the argument resulted in me and her not really speaking anymore.  We were just a hi-bye basis, or say hello to each other in passing, like what's up or so.  But at the very end of the argument she told me she hated me.

N.T., 11/19/14, at 156-57.

However, when asked if he could think of "one reason" why R.M. and S.G. "would come forward and say that [he] did these things to them[,]" Appellant replied, "I don't understand why they would say this, and I don't know a reason they have for saying this."  N.T. Trial, 11/19/14, at 212.  Yet, the court's ruling did not preclude Appellant from testifying that he had an argument with R.M. that was so severe that R.M. chose to fabricate sexual abuse allegations against him.  Appellant took the stand and chose not to offer that defense consistently throughout his testimony.  Instead, after defense counsel questioned him about this heated argument with R.M., Appellant went on throughout the remainder of his direct- and cross-examinations to repeatedly testify that he had no idea why R.M. was alleging the abuse.

Specifically, defense counsel asked him "why would two girls make up a story like this about you?" to which Appellant replied, "I have no idea.  I don't know why they would do something like this.  This is my family, and to

me it's just disgusting and I don't know why." N.T. Trial, 11/19/14, at 181. Later, defense counsel asked him if he had "[a]ny idea why [R.M.] would make something up like [the abuse allegations]," and Appellant replied, "No, I do not have any idea why she would make something up like that, and I'm trying to get to the bottom of it now…." *Id.* 194. On cross-examination, after the Commonwealth noted that Appellant "already testified on multiple occasions that there's not one reason [he] can think of for why these girls would come forward and say that [he] did these things to him," Appellant once again reiterated that that was "[c]orrect" and said, "I don't understand why they would say this, and I don't know a reason they have for saying this." *Id.* at 222.

We also find notable that on cross-examination, Appellant downplayed the damaging impact of the fight that he previously testified had 'soured' his relationship with R.M. In that exchange, the Commonwealth asked Appellant, "And aside from this one fight that you had talked about, you and [R.M.] had a great relationship, right?" *Id.* at 212. Appellant answered: "Yes. We had our regular differences as far as brother-sister -- little sibling arguments, but just that one big incident, and that was all. It was a good relationship." N.T. Trial, 11/19/14, at 212.

Appellant's testimony indicates that he chose not to fully pursue the defense that R.M. had a motive to lie or fabricate the charges against him. This cannot be explained by the court's ruling, as the court permitted Appellant to present evidence that he and R.M. had argued, and that after

the argument their "relationship went sour" and R.M. told Appellant "she hated [him]." *Id.* at 156-57. Had the court totally precluded evidence regarding Appellant's and R.M.'s argument, Appellant could contend that the court prohibited him from presenting this defense. However, the court permitted Appellant to testify about his argument with R.M., yet Appellant chose not to pursue that defense to the fullest degree possible under the trial court's ruling. He cannot now claim that he was prejudiced by the omission of that defense.

We are further convinced that any error in the exclusion of this evidence was harmless by the fact that there were multiple victims in this case. Here, R.M.'s accusations were corroborated by the fact that Appellant was also sexually abusing S.G. This was not the case in **Black**, which pitted only one victim's word against the defendant in that case, rendering motive-to-lie evidence in that case far more probative than in the instant matter. Moreover, R.M. did not even come forward until after S.G. made her own allegations, making it even more doubtful that R.M.'s claims were manufactured as a direct response to her argument with Appellant.

**Wall** is also distinguishable from the instant case. In **Wall**, the defendant had

> filed a motion *in limine* seeking to introduce evidence that the victim had been removed from her mother's home and placed in foster care after being sexually assaulted by her mother's paramour. Defense counsel argued in an *in camera* hearing on this issue that evidence of the victim's previous participation in the successful prosecution of an adult male who had sexually abused her was relevant to his defense of fabrication because it

- 13 -

tended to show that the victim may have been peculiarly aware of the fact that such a sexual abuse claim could lead to her removal from her aunt's home. Defense counsel urged that in view of the fact that there existed otherwise admissible evidence of the victim's desire to leave her aunt's home because of the strict discipline that her aunt often imposed, the evidence of the victim's prior participation in a materially similar prosecution was logically necessary to complete the fabrication theory. The trial court denied this motion, however, based on the Pennsylvania Rape Shield law, and allowed only the introduction of evidence that the victim resided with appellant and his wife because there was a "problem" at her mother's home.

*Wall*, 606 A.2d at 452 (footnote omitted).

Relying on *Black*, the *Wall* Court reversed the trial court's decision, noting first that:

Here, the excluded evidence established that the victim had, three years before this charge, alleged that her mother's paramour had sexually molested her. This, in and of itself, is not significant. Far more important, however, is the fact that the proffer also established that the victim participated in the successful prosecution of her former abuser, and that participation ultimately lead to her removal from her mother's house. From this, the jury could have inferred that the victim had, at the time she alleged that appellant had sexually abused her, labored under the impression that the making of another sexual abuse claim could result in her removal from her aunt and uncle's house. The victim's peculiar knowledge of the content and of the potential consequences of a sexual abuse claim was thus relevant to establish why the victim might have chosen to fabricate a specific type of claim, one of sexual abuse against an adult male in the house in which she lived and wanted to leave.

*Id.* at 462.

Thus, the *Wall* court concluded as follows:

In sum we find that in light of the evidence that the victim wanted to leave her aunt's home and harsh discipline, the specific proffer of uncontested evidence that the victim had been previously removed from a home in which she had successfully alleged that she had been sexually abused was relevant, non-

cumulative and more probative than prejudicial. To have excluded such evidence, *under these peculiar circumstances*, was to frustrate the truth-determining process by preventing consideration of exculpatory evidence to the defense.

*Id.* at 466 (footnoted omitted) (emphasis added).

Notably, as was the case in ***Black***, the critical issue in ***Wall*** was the weighing of the credibility of a single victim against the credibility of the defendant. Moreover, the ***Wall*** court stressed that it was the "peculiar" facts of that case that permitted evidence of the victim's prior, successful sexual abuse allegations, evidence which fit squarely within the defense's fabrication theory.[3] ***Id.*** Here, however, when afforded the opportunity to do so, Appellant repeatedly professed to have no knowledge of why R.M. would fabricate charges against him. Thus, we conclude that ***Wall*** also does not support reversal in this case.

Finally, in ***Eck***, a twenty-three-year-old defendant was accused of performing oral sex on his fifteen-year-old foster brother, T.H. The defense sought, by motion *in limine*, to admit evidence of T.H.'s juvenile record, which would have demonstrated that T.H. had performed that same act on his five-year-old brother in a different foster home. Eck argued that this evidence would substantiate his claim that T.H. had fabricated his accusation

---

[3] In ***Wall***, other admitted evidence, derived from the victim's own testimony, demonstrated that the victim had repeatedly acted out in other ways in her efforts to escape her aunt's home, such that the sexual abuse accusations appeared to be an escalation of those efforts.

against Eck. The trial court denied Eck's motion in limine as barred under the Rape Shield Law.

On appeal, this Court reversed that decision. Again, like **Black** and **Wall**, we were confronted with a case where the credibility of the defendant was at odds with the credibility of a single victim. At the time he made his accusations, Eck's victim was facing the prospect of violating his probation for underage drinking. The theory of the defense was that the victim had fabricated the charges against Eck in order to elicit sympathy for himself, because, "as the perpetrator of a sexual offense, T.H. learned that victims receive more favorable treatment than do perpetrators." **Eck**, 605 A.2d at 1255. In reversing, we remanded, as we did in **Black**, for "an *in camera* hearing to perform the requisite balancing" of probative versus prejudicial value of that evidence. **Id.**

**Eck** also does not compel reversal. Instantly, the trial court performed the 'requisite balancing' that was lacking in **Eck**. And, although we conclude that the trial court likely erred by excessively circumscribing the evidence Appellant could admit regarding R.M.'s relationship with an older man, we still conclude that error was harmless in the specific circumstances of this case. Again, Appellant failed to exploit what latitude he was given to present the contested evidence, and the evidence had a diminished probative value given the corroboration provided by S.G., and the fact that R.M.'s allegations followed S.G.'s. Accordingly, for all the aforementioned

reasons, we conclude that Appellant is not entitled to relief on this claim, as whatever evidentiary error occurred was harmless.

Next, Appellant claims the trial court erred when it permitted the Commonwealth to elicit testimony from two detectives that it was common in their experience for child victims to disclose information over time. Appellant complains that "[b]ecause testimony about common behaviors of child victims of sexual assault to explain why they may have divulged information over time was inadmissible to [A]ppellant's case and, in any event, was not given by a qualified expert, the trial court abused its discretion in allowing the Commonwealth to elicit the testimony. As such, he is entitled to a new trial." Appellant's Brief at 13.

Appellant refers to the following incidents at trial. First, during the testimony of Detective Gregory Meissler, the following transpired:

> [Prosecutor:] Calling your attention to your statement from [S.G.], and as counsel told you on cross-[examination], she has disclosed additional behavior from [Appellant], is it common in your experience for children to --
>
> [Defense counsel]: Objection. This calls for speculation.
>
> [Prosecutor]: in the detective's experience, counsel opened the door based on his question.
>
> THE COURT: Let me hear the question.
>
> [Prosecutor]: Okay.
>
> [Prosecutor:] In your experience is it common for children to give additional disclosures after the first interview?
>
> [Defense counsel]: I renew my objection.

THE COURT: That's sustained. Can you rephrase or something?

[Prosecutor]: Yes.

[Prosecutor:] Have you ever experienced a child giving additional disclosures after the first interview.

[Defense counsel]: I renew my objection.

THE COURT: Overruled.

[Detective Meissler:] Yes.

N.T., 11/19/14, at 59-60.

Next, during the testimony of Detective Thomas Brown, the following

exchange occurred:

[Prosecutor:] In – have you been made aware that [R.M.] has provided that additional disclosure that she had provided oral sex to [Appellant]?

[Detective Brown:] No.

[Prosecutor:] Okay. Approximately how many interviews with children have you conducted in your career?

[Defense counsel]: Objection to relevance.

THE COURT: Noted. But overruled. Go ahead.

[Detective Brown]: I'd put it in the thousands.

[Prosecutor:] And, in your experience have you had children give additional disclosures --

[Defense counsel]: I renew my objection. Irrelevant.

THE COURT: Noted. Overruled. Go ahead.

[Detective Brown]: Yes.

[Prosecutor:] Is that something that only happened once or substantial times?

[Detective Brown:] I think it's happened quite a few times.

- 18 -

*Id.* at 90-91.

With regard to Detective Meissler, it is clear that the trial court *sustained* Appellant's objection as it was presented: that the Commonwealth had called for mere speculation. The question was then rephrased to elicit the detective's direct knowledge of such instances. Appellant now presents us with a claim that the trial court erred by permitting speculative testimony about 'common behaviors of child victims of sexual assault.' No such response was permitted with respect to Detective Meissler; therefore, Appellant's claim lacks a foundation in the record. To the extent that Appellant now claims that the testimony elicited from Detective Meissler was inadmissible because it was not given by a qualified expert, Appellant waived that claim by not raising it before the trial court. "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a).

With regard to Detective Brown, the Commonwealth did not even ask a question eliciting speculation from the witness regarding 'common behaviors of child victims of sexual assault.' Thus, Appellant's claim is meritless with respect to his testimony as well. Similarly, any claim regarding the admissibility of the testimony given by Detective Brown based on the argument that he was not a qualified expert witness was similarly waived. Pa.R.A.P. 302(a).

Next, Appellant argues that the trial court erred when it required him to either testify before the jury from counsel's table, or, if he were to take

the stand, that he would have to do so with a sheriff standing behind him. Appellant argues that, "[b]y not allowing [him] to take the witness stand free of a visible security presence and testify like every other witness, the trial court sent a clear message to the jury that he was dangerous and deprived him of his right to the presumption of innocence." Appellant's Brief at 14. Ultimately, Appellant did take the stand with the sheriff standing behind him, and the trial court instructed the jury that "[A] defendant in a criminal case is always escorted by the sheriff. Don't think anything of it. That's his job being here in a criminal case." N.T., 11/19/13, 143.

Appellant cites a single case to support his argument, **Commonwealth v. Mayhugh**, 336 A.2d 379 (Pa. Super. 1975). In **Mayhugh**, a juror inadvertently observed Mayhugh being restrained by two sheriffs, one of whom was grasping Mayhugh's arm, as Mayhugh was brought into the courtroom. Defense counsel requested a mistrial, which was denied by the trial court. We affirmed. Nevertheless, we recognized the following principles:

> Due process of law guarantees respect for those personal immunities which are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental,' **Snyder v. Massachusetts**, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934), or are 'implicit in the concept of ordered liberty.' **Palko v. Connecticut**, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). **See Rochin v. California**, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Fundamental to the concept of due process is the principle that every person who stands accused of a crime is entitled to a fair and impartial trial. **Massey v. Moore**, 348 U.S. 105, 75 S.Ct. 145, 99 L.Ed. 135 (1954); **Betts v. Brady**, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed.

1595 (1942). Our courts long ago recognized that an essential ingredient of a fair trial is the presumption of innocence with which an accused is clothed. 'The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.' **Coffin v. United States**, 156 U.S. 432, 453, 15 S.Ct. 394, 403, 39 L.Ed. 481 (1895).

'The presumption of innocence,' as noted by the court in **Eaddy v. People**, 115 Colo. 488, 492, 174 P.2d 717, 718 (1946), 'requires the garb of innocence;' and the defendant is entitled to all the physical indicia consistent with innocence. **Kennedy v. Cardwell**, 487 F.2d 101 (6th Cir. 1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). Thus, from the earliest days of the common law a defendant in a criminal trial had the right to appear in court free of restraint. **State v. Roberts**, 86 N.J.Super. 159, 206 A.2d 200 (1965) (tracing the history of this rule from 1678); **See** Kranskopf, Physical Restraint of the Defendant in the Courtroom, 15 St. Louis U.L.J. 351 (1971). This right can be abrogated only in exceptional circumstances, such as where necessary to prevent escape, to protect those persons in the courtroom, and to maintain order during the trial. **See**, **e.g.**, **Commonwealth v. Cruz**, 226 Pa.Super. 241, 311 A.2d 691 (1973); **Woodards v. Cardwell**, 430 F.2d 978 (6th Cir. 1970), *cert. denied*, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971).

The rule is stated in the A.B.A. Project on Standards for Criminal Justice, Standards Relating to Trial by Jury s 4.1(c) (Approved Draft, 1968): 'Defendants and witnesses should not be subjected to physical restraint while in court unless the trial judge has found such restraint reasonably necessary to maintain order.' The comments explain that physical bonds may create prejudice in the minds of the jury against the accused. '(T)he jury must necessarily conceive a prejudice against the accused, as being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers.' **State v. Kring**, 64 Mo. 591, 593 (1877) Quoted in **Kennedy v. Cardwell**, **supra** at 106. 'It offends not only judicial dignity and decorum, but also that respect for the individual which is the lifeblood of the law.' **Illinois v. Allen**, 397 U.S. 337, 350-51, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353 (1970).

**Mayhugh**, 336 A.2d at 381-82.

We rejected Mayhugh's claim that he had been deprived of the cloak of innocence because 1) he was not seen physically restrained with handcuffs, and 2) the restraint observed, if observed at all, was minimal. Thus, on its face, *Mayhugh* does not directly compel reversal here, as no relief was even granted in that case.

Nevertheless, Appellant was not restrained in this case at all: the sheriff was only standing near him as he testified. Appellant fails to cite any authority which suggests that the presence of a sheriff or similar security official in the vicinity of a testifying defendant implicates that defendant's due process right to be cloaked in the presumption of innocence. Thus, Appellant's claim lacks merit.

In any event, at the beginning of Appellant's testimony, and in response to Appellant's concerns, the trial court instructed the jury not to take any adverse inference against Appellant from the presence of the sheriff, in an effort to mitigate any potential prejudice the presence of the sheriff might cause. N.T., 11/19/13, 143. Appellant did not object at trial that the instruction was insufficient to remedy any potential prejudice resulting from the sheriff's presence, nor does he argue now why that instruction was insufficient to cure any resulting prejudice. On this basis, even if we were to find that the trial court erred, we would deem that error harmless as it was adequately remedied by the trial court's instruction.

Finally, Appellant asserts that he was illegally sentenced under 18 Pa.C.S. § 9718, as that statute violated the rule set forth in *Alleyne,* 133

S.Ct. 2151 (holding any fact that increases mandatory minimum sentence for crime is an element of an aggravated crime, not a mere sentencing factor of the lesser, that must be submitted to jury and proven beyond a reasonable doubt). *See Commonwealth v. Wolfe*, 106 A.3d 800 (Pa. Super. 2014), *appeal granted*, 121 A.3d 433 (Pa. 2015). In *Wolfe*, this Court applied *Commonwealth v. Newman*, 99 A.3d 86 (Pa. Super. 2014) (*en banc*), to find 18 Pa.C.S. § 9718 unconstitutional under *Alleyne*. The trial court agrees, noting that "[b]ecause *Alleyne* …, … *Newman*, and now … *Wolfe* render mandatory minimum sentences pursuant to Section 9718 unconstitutional, Appellant's sentence should be vacated and remanded." TCO, at 16.

We agree with Appellant and the trial court. Appellant's IDSI sentence was unconstitutional under the *Alleyne*/*Newman*/*Wolfe* line of decisions.[4] Moreover, because we believe this may affect the trial court's overall

_____

[4] The Commonwealth suggests that we hold this matter pending our Supreme Court's consideration of the Commonwealth's appeal in *Wolfe*. *See* Commonwealth's Brief, at 19-21. We are well-aware that *Wolfe* presents a unique challenge to the *Newman* line of cases, as the Commonwealth aptly describes in its brief. *Id.* Nevertheless, *Wolfe* is clearly the law of this Commonwealth at the moment, and must therefore be dutifully applied by this Court. However, nothing in our decision today precludes the Commonwealth from seeking review in the Supreme Court of our decision to remand based on *Wolfe*. Indeed, because the Supreme Court is currently considering (or reconsidering) this Court's decision in *Wolfe*, we believe the Supreme Court is the appropriate venue in which to seek a stay of resentencing if, indeed, the Commonwealth believes justice requires such relief. With regard to the propriety of granting such a stay, we express no opinion.

sentencing scheme, as Appellant received consecutive sentences, we vacate Appellant's judgment of sentence in its entirety and remand for resentencing. *See Commonwealth v. Williams*, 997 A.2d 1205, 1210–1211 (Pa. Super. 2010) (stating that "if a correction by this Court may upset the sentencing scheme envisioned by the trial court, the better practice is to remand [for resentencing]") (internal quotations, citations, and corrections omitted).

In sum, we conclude that all of Appellant's trial- and pretrial-related claims either lack merit or constitute harmless error. Thus, we do not disturb his conviction. However, because Appellant was illegally sentenced pursuant to an unconstitutional statute, 18 Pa.C.S. § 9718, we vacate his judgment of sentence in its entirety and remand for resentencing consistent with the *Alleyne*/*Newman*/*Wolfe* line of decisions.

Judgement of sentence *vacated*. Case *remanded* for resentencing. Jurisdiction *relinquished*.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/20/2016

- 24 -